IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC HEMPHILL,

    *Plaintiff*,

    v.

ARAMARK CORPORATION, *et al.*,

    *Defendants*.

Civil Action No. 1:12-cv-01584-ELH

## MEMORANDUM OPINION

Plaintiff Eric Hemphill, who is self-represented, has sued ARAMARK Corporation and ARAMARK Campus Services, LLC, defendants (collectively, "ARAMARK," unless otherwise noted), pursuant to Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. §§ 2000e *et seq.*; the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code (2009 Repl. Vol., 2013 Supp.), State Gov't. §§ 20-606 *et seq.*; and Maryland common law.[1] Amended Complaint ("Am. Compl.," ECF 47). In particular, Hemphill alleges employment discrimination based on race (Count 1); retaliation (Count 2); wage discrimination based on race (Count 3); unlawful termination based on race (Count 4); breach of contract (Count 5); and wrongful discharge based on race (Count 6).[2]

---

[1] Suit was initially filed in the Circuit Court for Baltimore City against ARAMARK, Inc., which defendants assert is a misnomer. ARAMARK Campus Services, LLC, "a wholly-owned indirect subsidiary of ARAMARK Corporation," ECF 8, removed the case to federal court, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. *See* ECF 1.

[2] When suit was initially filed, Hemphill was represented by counsel. However, counsel later moved to withdraw, ECF 20, and that motion was granted. ECF 25. Hemphill subsequently moved for leave to file an amended complaint in order to include additional allegations. ECF 33. He also sought to correct the name of defendant "ARAMARK, Inc." to "ARAMARK Campus, LLC" and to add ARAMARK Corporation as a defendant. *See id.* Defendant opposed the motion, ECF 30, 43, and plaintiff replied in a filing styled as a "Motion for Rule 56 Summary Judgment." ECF 44. By Memorandum Opinion and Order dated January

At the conclusion of discovery, plaintiff filed a motion for summary judgment and a supporting memorandum (ECF 68) (collectively, "Motion"), asserting that the Court should award judgment as a matter of law under the doctrine of spoliation because defendant withheld critical evidence.[3] In a consolidated submission, defendants opposed plaintiff's Motion and filed a cross-motion for summary judgment (ECF 69) (collectively, "Cross-Motion").[4] Plaintiff

---

2, 2013 (ECF 45, 46), I granted Hemphill's motion to amend. But, I denied his motion for summary judgment as premature, without prejudice to the right to renew the motion after discovery. *Id.*

[3] Plaintiff submitted numerous exhibits with the Motion, including: (1) plaintiff's Application for Employment, dated August 5, 2004 (Ex. A); (2) plaintiff's "New Hire Paperwork," dated August 20, 2004 (Ex. B); (3) plaintiff's "New Employee Orientation Check List" (Ex. C); (4) plaintiff's Social Security number verification form (Ex. D); (5) a copy of the ARAMARK staffing center's on call policy, signed by plaintiff (Ex. E); (6) page 25 of the "ARAMARK Handbook" (Ex. F); (7) a copy of ARAMARK Campus LLC's Fed. R. Civ. P. 7.1 disclosure statement and a copy of defendants' February 27, 2013 status report (Ex. G); (8) an "Employee Hotline Fraud Complaint" regarding plaintiff (Ex. H); (9) plaintiff's Performance Improvement Plan (Ex. I); (10) a "Letter of Intent to Sue" written by plaintiff on December 27, 2011 (Ex. J-1), a Mt. Washington Conference Center and Keswick 2011 Organizational Chart (Ex. J-3); a note asserting that the "new organizational chart is part of the retaliation and discrimination against Eric Hemphill" (Ex. J-2), and the dismissal notice issued by the Equal Employment Opportunity Commission ("EEOC") (Ex. J-4); (11) and "Previous Organizational Charts" (Ex. K-1 – K-4). Plaintiff has also included the Hotline Call Investigation Form completed for plaintiff; plaintiff's "Supplemental Request for Documents and Admissions;" the EEOC letter enclosed with the dismissal notice; a position statement that ARAMARK submitted to the EEOC on April 29, 2011; plaintiff's interrogatories and request for admissions; and answers to interrogatories, presumably completed by plaintiff. The page number references in citations to plaintiff's exhibits are to the Bates number, where available.

[4] The exhibits submitted in support of defendants' Cross-Motion include: (1) plaintiff's Application for Employment, dated August 5, 2004 (Ex. A); (2) plaintiff's deposition, taken January 9, 2013 (Ex. B); (3) Inmate Information for NYS Department of Correctional Services (Ex. C); (4) the Declaration of Scott Beyer, General Manager of the Mount Washington Conference Center ("Beyer Decl.," Ex. D); (5) "Defendant's Objections and Responses to Plaintiff's Requests for Admission" (Ex. E); (6) the Declaration of Bonnie Ellis, a Human Resources Associate with ARAMARK Higher Education ("Ellis Decl.," Ex. F), with attachments (Ellis Decl. Ex. 1-7); (7) "Plaintiff's Supplemented Responses to ARAMARK Campus, LLC's First Set of Interrogatories Directed to Plaintiff" (Ex. G); (8) "Defendants' Objections and Responses to Plaintiff's 'Supplemental Request(s) for Documents and Admissions'" (Ex. H); and (9) plaintiff's Performance Improvement Plan (Ex. I).

subsequently moved for leave to file a second amended complaint ("Motion to Amend," ECF 74), which defendants oppose. ECF 80.

The motions have been fully briefed,[5] and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that follow, I will deny plaintiff's Motion and plaintiff's Motion to Amend, and I will grant defendants' Cross-Motion.

## Factual and Procedural Background

On August 5, 2004, plaintiff, who is African-American, submitted an employment application with ARAMARK, a leading food service provider. *See* Def. Ex. A; Pla. Ex. A; Pla. Dep. at 10-12. On the application, plaintiff responded "No" to the following question: "Have you ever been convicted of a crime (misdemeanor or felony)?" Def. Ex. A, ECF 69-1 at 5; Pla. Ex. A, AMK_HEM_000001. As the question indicates, it was not limited in duration or scope. Hemphill also signed an acknowledgment stating: "I understand and agree that any misrepresentations or omission of facts in my application may be justified for refusal to hire, or termination of employment." Def. Ex. A, ECF 69-1 at 8; Pla. Ex. A, AMK_HEM_000004.

ARAMARK, through its Regional Staffing Center, hired plaintiff on August 20, 2004. *See* Acknowledgment ("Ellis Decl. Ex. 5," ECF 69-1 at 144); Plaintiff's Affidavit at 1:22-23 ("Pla. Aff.," ECF 68-1). He was an at-will employee. *See* Def. Ex. A, ECF 69-1 at 8; Def. Ex.

---

[5] I have also considered plaintiff's opposition to defendants' Cross-Motion, styled as a "Rebuttal to Plaintiff's Motion for Summary Judgment and Defendants' Cross Motion" ("Rebuttal," ECF 73), and defendants' "Reply Memorandum of Law in Further Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment" ("Reply," ECF 75). In connection with a filing styled as "Plaintiff's Response to Defendant's Motion for Sur Reply and Rebuttal to Defendants' Motion in Support of Summary Judgment" ("Response to Motion for Surreply," ECF 81), plaintiff attached a number of exhibits, including: a March 7, 2011 Charge of Discrimination and March 14, 2011 amended Charge of Discrimination; a May 9, 2011 Notice of Charge of Discrimination, issued in response to plaintiff's amended charge; a March 16, 2011 Notice of Charge of Discrimination; a December 7, 2010 Notice of Charge of Discrimination; a November 5, 2010 Notice of Charge of Discrimination; and an EEOC Intake Questionnaire, completed September 24, 2010.

E, Response to Interrogatory No. 2. The Staffing Center initially placed plaintiff in the position of Cook at the Johns Hopkins Bayview Facility at the Mount Washington Conference Center ("MWCC") in Baltimore. *See* Pla. Dep. at 10-14. Shortly after plaintiff was hired, the manager of the Bayview Facility sent plaintiff back to the Staffing Center because he was "dissatisfied with [plaintiff's] work performance." Pla. Dep. at 13:13-19. Around September 2004, the Staffing Center reassigned plaintiff to the position of a temporary Cook at the Piper Facility, another building at MWCC. Pla. Dep. at 13:19-22 – 14:1-3, 14:13-15. Plaintiff transitioned into a permanent Cook position at the Piper Facility on or about November 18, 2004. *See* Pla. Dep. at 9:6-14, 14:16-21; Beyer Decl. at ¶ 5; Pla. Aff. at 1:25-27.

On July 11, 2005, ARAMARK promoted plaintiff to "Chef/Manager" at the Piper Facility. Beyer Decl. at ¶ 6. Plaintiff refers to the position as "Executive Chef." Pla. Dep. at 14:22 – 15:1-9. As a Chef/Manager at the Piper Facility, plaintiff was responsible for "placing food orders, maintaining and tracking inventory, managing up to eight employees, and overseeing attendance," as well as "minimal catering functions" during occasional events on weekday evenings. Beyer Decl. at ¶ 7. Initially, plaintiff reported to Marianne Beauchamp, the Food and Beverage Director, and Tim Murphy, the Assistant General Manager. *Id*. at ¶ 8.

According to Scott Beyer, the General Manager of the MWCC, Hemphill's "job performance as Chef/Manager was generally acceptable until 2010." Beyer Decl. at ¶ 9. However, in early 2010 ARAMARK received complaints about Hemphill's treatment of other employees, including allegations that Hemphill "raised his voice, yelled and cursed at subordinate employees and that he displayed an insubordinate attitude toward Ms. Beauchamp and Mr. Murphy by storming out of meetings." *Id*. at ¶ 10. In addition, Beyer claims that Hemphill's level of care for customer/client service was not acceptable, he failed to perform

standard managerial tasks, and he violated ARAMARK's policy concerning notification of absence from work. *Id.* at ¶ 11. For his part, plaintiff avers that he complained to Murphy in October 2010 about unequal pay and unfair treatment. Pla. Aff. at 1:36-38.

In an effort to improve Hemphill's performance, ARAMARK changed Hemphill's reporting structure in January 2011, so that he reported directly to Beyer. *See id.* at ¶¶ 8, 12.[6] At his deposition, plaintiff indicated that it was his belief that the change in reporting structure occurred due to complaints that staff made about Beauchamp and Murphy. *See* Pla. Dep. at 16:20-22 – 17:1-15. In any event, according to Beyer, Hemphill's performance did not improve, despite the change in reporting structure. *See* Beyer Decl. at ¶ 13. On March 1, 2011, with the approval of ARAMARK's Human Resources Division, Beyer placed Hemphill on a 60-day Performance Improvement Plan ("PIP"), which Hemphill completed. *Id.*; *see* Pla. Ex. I; Def. Ex. I.

In 2011, ARAMARK received two anonymous complaints about Hemphill through its Employee Hotline, both alleging that, on his employment application, Hemphill had been untruthful about his criminal history. *See* Ellis Decl. at ¶ 4; Employee Hotline Complaints ("Ellis Decl. Ex. 1," ECF 69-1 at 72, 79). Specifically, a complaint filed online on January 2, 2011, alleged: "Mr. Hemphill has been convicted of three felonies in the state of New York, of one which included manslaughter." Ellis Decl. Ex. 1, ECF 69-1 at 72. Likewise, a complaint of June 5, 2011, reported: "Mr. Hemphill obtained employment of your company by misleading the company in stating that he had no prior felony convictions. If you do a background search in Staten Island, New [Y]ork it will show that Mr. Hemphill has three violent felonies including

---

[6] At his deposition, plaintiff testified that he believed the change in reporting structure occurred "sometime in 2010 . . . sometime around there." Pla. Dep. at 16:13-19. The discrepancy is not material.

drug charges as well." Ellis Decl. Ex. 1, ECF 69-1 at 79. The complaint of January 2, 2011, also included inmate information sheets from the New York State Department of Correctional Services, which outlined the details of plaintiff's convictions and the location and dates of his incarceration. *See* Ellis Decl. at ¶ 4; Ellis Decl. Ex. 1, ECF 69-1 at 72-78.

ARAMARK's Employee Relations division subsequently conducted an investigation of the allegations left with the hotline. Ellis Decl. at ¶ 5. The investigation revealed Hemphill's incarceration at Collins Correctional Facility in Buffalo, New York, which overlapped with his period of alleged employment at "Collins Café" in Buffalo, New York, as reported by Hemphill on his employment application of August 5, 2004. Ellis Decl. at ¶ 5; *compare* Def. Ex. A, ECF 69-1 at 7 with Def. Ex. C, ECF 69-1 at 42. Based on this information, ARAMARK determined that it had reason to believe that Hemphill had lied on his employment application when he claimed that he had not been convicted of a crime. Ellis Decl. at ¶ 6. Under the Conduct Guidelines set forth in the Employee Handbook that applied to Hemphill, falsifying information on the employment application was an offense that could result in "disciplinary action up to and including dismissal, with or without any written warnings." Ellis Decl. Ex. 4 (ARAMARK Higher Education Employee Handbook at 22-23); *see* Ellis Decl. at ¶ 7.

In the meantime, on March 7, 2011, plaintiff filed with the Maryland Commission on Human Relations ("MCHR")[7] a charge of discrimination against "ARAMARK, INC.", alleging

---

[7] In 2011, the MCHR changed its name to the Maryland Commission on Civil Rights ("MCCR"). Maryland is a deferral jurisdiction under Title VII. A deferral jurisdiction is a state that has a law prohibiting employment discrimination on the same bases covered by the federal statutes, and authorizing a state or local agency to grant or seek relief from such discrimination. *See* 42 U.S.C. § 2000e–5(c), (d); *see, e.g.*, *Edelman v. Lynchburg Coll.,* 300 F.3d 400, 404 & n.3 (4th Cir. 2002); *Prelich v. Med. Resources, Inc.*, 813 F. Supp. 2d 654, 661-62 (D. Md. 2011). The MCCR is now the applicable state enforcement agency. *See* 29 C.F.R. § 1601.74 (listing qualifying state enforcement agencies).

that he was the victim of race discrimination. *See* ECF 81 at EEOC_000082; *see also* Am. Compl. ¶ 14; Pla. Ex. J-4. Plaintiff filed an amended charge of discrimination on March 17, 2011, adding a claim of retaliation. *See* ECF 81 at EEOC_000081. According to plaintiff, he "received good evaluations since being hired in 2004 through 2010 when he filed his claim with the EEOC." Pla. Aff. at 1:38 – 2:39. Further, plaintiff attested that after ARAMARK was notified of his EEOC complaint, he began to suffer retaliation by ARAMARK management in the form of "interference with job duties, refusal to perform job evaluations linked to performance pay increases, increased workload, reduced labor, given a write up for calling out of work 1 time in 6 years contrary to [the] Aramark employee handbook, being placed on a 90 day performance based probation for 120 days, change in job status (demoted from executive Chef to Chef/Manager, and made to report to another Executive Chef with less qualifications and seniority), and finally wrongful termination." Pla. Aff. at 2:39-47. On November 30, 2011, the Equal Employment Opportunity Commission ("EEOC") dismissed Hemphill's charge and notified him of his right to sue. *See* ECF 2-1; Pla. Ex. J-4.

On January 13, 2012, ARAMARK's Human Resources Director Steven Christian and Human Resources Associate Bonnie Ellis met with Hemphill. Ellis Decl. at ¶ 6, 8; *see* Pla. Dep. at 52, 70:19-22 – 71:1-2; Ellis. Decl. Ex. 2, ECF 69-1 at 81. At his deposition, plaintiff recalled that he began the meeting by discussing his complaints with the reporting structure. *See* Pla. Dep. at 54. Plaintiff told Ellis and Christian that he believed the new reporting structure was implemented in retaliation for his complaints and that he thought it was "unfair" that he reported

---

Both the MCHR and the MCCR have enjoyed a work-sharing agreement with the Equal Employment Opportunity Commission. As a result, "a claim filed before one commission is effectively filed before both." *Valderrama v. Honeywell Tech. Solutions, Inc.,* 473 F. Supp. 2d 658, 662 n.2 (D. Md. 2007); *see E.E.O.C. v. Techalloy Maryland, Inc.*, 894 F.2d 676, 677-78 (4th Cir. 1990).

"to another executive chef when [he] was an executive chef." Pla. Dep. at 54:14-18. The topic of the meeting then turned to the allegations that plaintiff had falsified information on his employment application. *See* Pla. Dep. at 55:1-10.

At the meeting, Christian and Ellis showed Hemphill the inmate information sheets and asked him to sign an authorization form allowing ARAMARK to conduct a background check to determine plaintiff's criminal history. Ellis Decl. at ¶ 8; *see* Pla. Dep. 55:15-18. Christian and Ellis advised plaintiff that, if he did not complete the authorization form, they would make a decision regarding his continued employment based on the information that ARAMARK currently possessed. *See* Ellis Decl. at ¶ 8; Pla. Dep. at 83:9-14. Hemphill told Christian and Ellis that he wanted to think about the authorization request; he did not confirm or deny that he had been convicted of the crimes listed on the inmate information sheets. Ellis Decl. at ¶ 9; *see* Pla. Dep. at 56:2-6. ARAMARK suspended Hemphill while he (Hemphill) considered whether to authorize the background check. Ellis Decl. at ¶ 10; Pla. Dep. at 83:15-22.

Ultimately, Hemphill refused to authorize the background check. Ellis Decl. at ¶ 11; *see* Pla. Dep. 56:12-22 – 57:1-4. As a result, ARAMARK terminated Hemphill's employment, effective January 26, 2012, based on his dishonesty in connection with his employment application. Ellis Decl. at ¶ 12. According to Beyer, ARAMARK had been unaware of Hemphill's criminal history and the false statement on his employment application because ARAMARK did not have a mandatory background check policy at the time Hemphill was hired. Beyer Decl. at ¶ 3.

When Hemphill was confronted with the inmate information sheets attached to the Employee Hotline complaint at his deposition, he admitted that he was incarcerated beginning in 1995 for a conviction of manslaughter in the second degree, and was subsequently transferred to

the Collins facility in April 1997, where he remained through May 2002. *See* Pla. Dep. at 59-65, 68. He also admitted that he was incarcerated from February 1988 through August 1989 for criminal possession of a weapon in the third degree, and from May 1993 to May 1994 for attempted criminal possession of a weapon in the third degree. *Id.* at 66-69. However, plaintiff claimed that when he completed his August 2004 employment application, he asked an administrative assistant about the criminal background question: "I said: 'If I had a criminal history that was older than five years would it matter,' and she said: 'No, don't worry about it.'" *See* Pla. Dep. at 19:12 – 20:18. According to plaintiff, he did not provide the administrative assistant with any detail in regard to his criminal history. *Id.* at 20:6-8.

## Discussion

### A.  Summary Judgment – Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Liberty Lobby*, 477 U.S. at 247-48 (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003). Moreover, because plaintiff is a self-represented litigant, his pleadings are "'liberally construed'" and "'held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citation omitted).

**B.** **Plaintiff's Motion for Summary Judgment**

Hemphill contends that he is entitled to summary judgment because "[d]efendants have attempted to defraud the court and engage in spoliation by the withholding of evidence and submitting fraudulent documents as well." Motion, ECF 68 at 1. He asserts that "Defendants' inability to produce such documents prove the pretexted [sic] nature of plaintiff's termination and his related claim" and that "if the Defendants produced the evidence it would undoubtedly prove Plaintiff's case that his termination was mere pretext in retaliation to his EEOC complaint." Motion, ECF 68 at 2, 8.

In particular, plaintiff insists that defendants have intentionally withheld a second employment application and second set of new hire paperwork from November 2004, which plaintiff allegedly completed when he transitioned to the Chef/Manager position. *See* Motion, ECF 68 at 9; *see also* Pla. Dep. at 9; Pla. Aff. at 1:22-34. Plaintiff maintains that this application "expressly inquired as to any criminal convictions in the past 7 years," and that he truthfully responded "no." Motion, ECF 68 at 4. Moreover, he argues that the original "contract or relationship between Plaintiff and Aramark Food and Support Services was terminated in 11/2004," when he changed positions, and therefore he cannot be fired from a later period of employment with ARAMARK Campus Services for falsifying an application for an earlier period of employment with ARAMARK Food and Support Services. *See id.* at 9. Thus, he contends that the documents pertaining to his change in position in November 2004 are relevant to show that he did not falsify the purported November 2004 application with respect to his criminal history. *See id.* at 4.

Defendants vigorously deny that they have withheld an employment application or new hire paperwork from November 2004. In response to plaintiff's interrogatories, defendants

explained: "Plaintiff was hired in August 2004 and filled out new hire paperwork in August 2004, not November 2004." Def. Ex. E, Response to Interrogatory No. 5. Defendants also stated: "ARAMARK is unaware of any new hire paperwork that should have been contained in Plaintiff's personnel file that is not contained in it." *Id.*; *see also* Def. Ex. E, Response to Interrogatory No. 3. And, Beyer attested: "I have searched ARAMARK's records at MWCC, including Mr. Hemphill's personnel file, and I have not found any employment application or new hire paperwork completed by Mr. Hemphill as part of this November 2004 transition." Beyer Decl. at ¶ 5. Further, defendants argue that, at the very least, plaintiff's Motion should be denied because "Defendants dispute this allegation, making it a disputed issue of fact," and "even assuming it as true, it would not result in a judgment in favor of Plaintiff." ECF 69 at 19.

Plaintiff's argument hinges on the doctrine of spoliation. "The evidentiary spoliation doctrine is a rule of evidence, administered at the discretion of the trial court to respond to circumstances in which a party fails to present, loses, or destroys evidence." *Hartford Ins. Co. of Midwest v. Am. Automatic Sprinkler Sys., Inc.*, 23 F. Supp. 2d 623, 626 (D. Md. 1998) (Davis, J.), *aff'd*, 201 F.3d 538 (4th Cir. 2000) (citing *Anderson v. Nat'l R.R. Passenger Corp.,* 866 F. Supp. 937, 945 (E.D. Va. 1994), *aff'd,* 74 F.3d 1230 (4th Cir. 1996)). Under the spoliation doctrine, a court may order dismissal, grant summary judgment, or permit an adverse inference to be drawn against a party in order to "level the evidentiary playing field and for the purpose of sanctioning improper conduct." *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir. 1995).

However, "spoliation does not result merely from the 'negligent loss or destruction of evidence.'" *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). For spoliation to occur, "the alleged destroyer must have known that the evidence was relevant to some issue in the

anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction. Although the conduct must be intentional, the party seeking sanctions need not prove bad faith." *Id.* (citations and internal quotation marks omitted); *see also Goodman v. Praxair Servs., Inc.,* 632 F. Supp. 2d 494, 505 (D. Md. 2009) (setting forth the elements that a party seeking spoliation sanctions is required to prove).

Plaintiff objects to consideration of the declarations of Beyer and Ellis to the extent that "they have no personal knowledge as to the events that transpired in November of 2004 concerning Plaintiff's hiring and the language contained in the mentioned job application at that time." ECF 73 at 3.[8] Declarations submitted on summary judgment must contain admissible evidence, premised on personal knowledge. *See* Fed. R. Civ. P. 56(c); *see also Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). But, Beyer attested that he obtained the information in his affidavit through the performance of his duties at ARAMARK and his review of business documents kept by ARAMARK in the ordinary course of business. Beyer's statement that he searched ARAMARK's personnel records and was unable to locate an application completed by Hemphill in November 2004 reflects personal knowledge as to the search and the content of ARAMARK's personnel records. That Beyer did not personally observe plaintiff's job transition would not defeat the admissibility of such testimony. Moreover, personnel records are generally admissible at trial as business records, pursuant to Fed. R. Evid. 803(6). *See Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 714 n.2 (D. Md. 2011). And, evidence that a matter is not included in a record is also admissible in accordance with Fed. R. Evid. 803(7).

---

[8] Beyer has been employed with ARAMARK since 2006. Beyer Decl. at ¶ 2. Ellis began employment with ARAMARK in May 2011. Ellis Decl. at ¶ 2.

Imposition of spoliation sanctions is plainly unwarranted here. Plaintiff has offered only bare allegations that he completed a second employment application in November 2004, and has not demonstrated that defendants intentionally destroyed it. Moreover, he has failed to demonstrate the relevance of the alleged second employment application and new hire paperwork, even if they exist. In other words, even if plaintiff completed a second employment application and new hire paperwork when he became Chef/Manager in November 2004, such documents would have no bearing on the issue of whether plaintiff lied on his August 2004 employment application when he responded that he had no criminal history. And, even if one ARAMARK division terminated plaintiff's employment based on an application he completed for another ARAMARK entity, ARAMARK's decision to do so would not establish that the termination of plaintiff's employment was pretextual. *See Uy v. Mount Sinai Hosp.*, No. 10 Civ. 5674(LAP), 2012 WL 4560443 (S.D.N.Y. Sept. 30, 2012) (finding that plaintiff failed to establish pretext where she argued that "she [could not] be fired from a later period of employment for falsifying an application for an earlier employment period, so when Defendants terminated her, they did so because of her age," and reasoning that "logic supports[] that an employer can fire an employee for lying on a job application, regardless of when the falsification occurred").

Accordingly, the production of a November 2004 application would not, as plaintiff contends, prove that "there was no fraud during the hiring process and his termination was retaliation for his EEOC complaint." *See* Motion, ECF 68 at 9. For these reasons, plaintiff's Motion will be denied.

**C.**　　　　　**Defendants' Cross-Motion for Summary Judgment**

*1. Title VII/MFEPA Claims (Counts 1, 2, 3, 4, and 6)*

In his suit, Hemphill lodges numerous Title VII and MFEPA claims: employment discrimination (Count 1); retaliation (Count 2); wage discrimination (Count 3); unlawful termination (Count 4); and wrongful discharge (Count 6). In particular, plaintiff appears to bring his unlawful termination and wage discrimination claims under both MFEPA and Title VII.

MFEPA "is the state law analogue of Title VII." *Alexander v. Marriott Int'l, Inc.,* No. RWT 09-cv-2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011). Maryland courts interpreting MFEPA have often found federal cases arising under Title VII to be persuasive authority. *See, e.g.*, *Taylor v. Giant of Maryland, LLC*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494, 578 A.2d 766 (1990); *Md. Shipbuilding & Drydock Co., Inc. v. Md. Comm'n on Human Rel.,* 70 Md. App. 538, 545-50, 521 A.2d 1263 (1987); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n.8, 66 A.3d 1152, 1166 n.8 (2013). And, plaintiff has not asserted a distinction between his federal and state discrimination claims. Accordingly, I will apply the same standards to my analysis of plaintiff's state and federal law discrimination claims. *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012) ("Plaintiff's state law racial discrimination claim duplicates his Title VII racial discrimination claim and fails for the same reasons.").

　　a.　Title VII Methods of Proof

Title VII prohibits an employer from, *inter alia*, discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Moreover, as amended by the Civil Rights Act of 1991, Title VII expressly provides for "mixed-motive"

liability, stating: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e–2(m).

In general, there are "two avenues" at trial by which a plaintiff may prove that an adverse employment action amounts to intentional employment discrimination.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc).  The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'"  *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted).  "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'"  *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original).

The second avenue available to the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[9] The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).  Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial]

---

[9] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII of the Civil Rights Act of 1964.  However, the burden-shifting methodology it endorsed has been adapted for use in other statutory contexts.  *See, e.g.*, *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2006) (applying *McDonnell Douglas* framework to claim of employer retaliation for taking FMLA-protected leave); *see also Young v. United Parcel Service, Inc.*, 707 F.3d 437, 445-46 (4th Cir. 2013) (applying *McDonnell Douglas* framework to Title VII sex discrimination claim); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50-52 & n.3 (2003) (applying *McDonnell Douglas* framework in employment discrimination case under Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*).

never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n. 2 (4th Cir. 1989) (citation omitted).

Absent direct evidence of discrimination, the plaintiff at trial must first establish, by a preponderance of the evidence, a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Although the precise formulation of the required *prima facie* showing will vary in "differing factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff in an employment discrimination suit is generally required to show that the employer took adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a *prima facie* case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510–11. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983).

When the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

To be sure, the relevance of the *McDonnell Douglas* scheme outside of the trial context is limited. The Fourth Circuit has admonished district courts at the summary judgment stage to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). Further, the Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 294–95 (citation omitted). Nevertheless, the Court has referred to the *McDonald Douglas* proof scheme in analyzing the propriety of an award of summary judgment. *See*, *e.g.*, *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510 (4th Cir. 2006).

Plaintiff has not proffered any direct evidence of intentional discrimination. Accordingly, he must pursue his claims under the second avenue described in *McDonnell Douglas.*

b. <u>Employment Discrimination (Count 1)</u>

Plaintiff claims that ARAMARK violated Title VII's prohibition on race discrimination in employment. He points to several incidents to support his claim. In particular, Hemphill alleges that ARAMARK required him to perform more work than his non-African-American colleagues; he was required to report to the client when the kitchen ran out of supplies; ARAMARK placed him on a Performance Improvement Plan ("PIP") and issued a written counseling statement to him for discriminatory reasons; he was paid less than his non-African-American peers; and his employment was terminated on the basis of his race.[10]

To establish a *prima facie* case of discrimination in employment, a plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action and (4) that similarly-situated employees outside the protected class received more favorable treatment. *Gerner v. Cnty. of Chesterfield, Va.*, 674 F.3d 264, 266 (4th Cir. 2012) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)); *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, --- U.S. ----, 132 S. Ct. 1327 (2012).

Defendants argue that some of the incidents cited by plaintiff "do not constitute adverse employment actions necessary for a *prima facie* case of discrimination." Cross-Motion, ECF 69 at 27 n.8.[11] The Fourth Circuit has explained: "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of a plaintiff's employment." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (internal quotation marks, citation, and alterations omitted). The Court has described an "adverse

---

[10] Some of these allegations form the basis of other discrimination claims, discussed *infra*.

[11] Clearly, termination constitutes an adverse employment action. Termination is the subject of Counts 4 and 6 and is addressed, *infra*.

employment action" as one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin,* 178 F.3d 253, 255 (4th Cir. 1999); *see also James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004). "'Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment.'" *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 598 (D. Md. 2011) (Chasanow, J.) (quoting *Geist v. Gill/Kardash P'ship,* 671 F. Supp. 2d 729, 737 n.6 (D. Md. 2009)), *aff'd*, 465 Fed. Appx. 274 (4th Cir. 2012).

Plaintiff complains that he was required to perform more work while he was Chef/Manager than his non-African-American colleagues. This allegation appears to be founded on plaintiff's contention that he had more duties than those who previously held the position of Chef/Manager at the Piper Facility, including that he was required to report to the client directly when the kitchen ran out of supplies. Plaintiff has failed to demonstrate that any increase in workload had a tangible effect on the terms and conditions of his employment, so as to constitute an adverse employment action. Notably, "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson,* 264 F. Supp. 2d 314, 329 (D. Md. 2003).

"[I]t is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). Although plaintiff's colleagues at the McAuley Café apparently were not required to

report to their client about inventory, plaintiff acknowledged at his deposition that the McAuley Café served a different client. Pla. Dep. at 96-97. And, plaintiff acknowledged that, prior to the imposition of the reporting requirement, there had been complaints from the client of the Piper Cafeteria with respect to running out of inventory. *See* Pla. Dep. at 94-97.

"An action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of [his] employment, is not an adverse employment action." *Spriggs v. Pub. Serv. Comm'n of Maryland*, 197 F. Supp. 2d 388, 393 (D. Md. 2002). *See Hawkins v. Leggett*, 955 F. Supp. 2d 474, 491-92 (D. Md. 2013) (finding plaintiff's argument that "his post assignment amounted to an adverse action because it was more stressful or difficult" to be "an inadequate evidentiary basis to survive summary judgment"), *aff'd sub nom. In re Canarte*, No. 13-2236, 2014 WL 842111 (4th Cir. Mar. 5, 2014); *Boone,* 178 F.3d at 255– 56 ("Although [plaintiff] may have experienced increased stress in the new job . . ., she did not allege discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion . . . .").

Similarly, plaintiff has not demonstrated a tangible effect on the terms and conditions of his employment as a result of the written counseling statement he received for not following the appropriate procedures for reporting absence from work. "Reprimands, whether oral or written, do not *per se* significantly affect the terms or conditions of employment." *Lewis v. Forest Pharmaceuticals, Inc.,* 217 F. Supp. 2d 638, 648 (D. Md. 2002) (citations omitted). Rather, a reprimand is a "tangible employment action" when "evidence shows that a reprimand not only bruises an employee's ego or reputation, but also works a real, rather than speculative, employment injury." *Id*. Because plaintiff has not proffered evidence to show that the counseling statement had a tangible effect on plaintiff's employment, he has failed to establish

an adverse employment action with respect to it. *See Newman v. Giant Food, Inc*., 187 F. Supp. 2d 524, 529 (D. Md. 2002) (plaintiff could not establish that the verbal warning or counseling letter he received for arriving late was an adverse action "without evidence that the warning could lead to further disciplinary action, such as termination"), *aff'd sub nom. Skipper v. Giant Food Inc*., 68 Fed. Appx. 393 (4th Cir. 2003); *Nye v. Roberts*, 159 F. Supp. 2d 207, 214 (D. Md. 2001) (finding a reprimand letter did not amount to an adverse employment action, where the letter only asked plaintiff to correct her behavior, and "did not state that it would lead to her termination or demotion or a decrease in pay"), *vacated on other grounds*, 47 Fed. Appx. 247 (4th Cir. 2002).

Moreover, even if the PIP constituted an adverse employment action, Hemphill cannot establish a *prima facie* case of race discrimination; he has not generated evidence from which a reasonable juror could conclude that he was satisfactorily performing his job at the time of the PIP. Beyer's memorandum to plaintiff on March 1, 2011, set forth in detail problems with plaintiff's performance, which gave rise to the PIP. Def Ex. I; Pla. Ex. I. To illustrate, the memorandum explained that plaintiff demonstrated "significant deficiencies" in his "focus, effort, and outcomes;" frequently missed deadlines, including submissions of payroll, time sheets, inventory, invoices, and vending reports; inadequately trained employees; and failed to communicate key information effectively, which led to service issues. *Id*. *See Parish v. Siemens Med. Solutions USA, Inc.*, 429 Fed. Appx. 216, 218 (4th Cir. 2011) (concluding that the plaintiff had failed to meet the employer's legitimate expectations where "[t]he record was replete with examples of management dissatisfaction with [plaintiff's] performance"); *Shun-Lung Chao v. Int'l Bus. Machines Corp.*, 424 Fed. Appx. 259, 261 (4th Cir. 2011) (concluding that plaintiff was not performing his job duties at a level that met his employer's legitimate expectations where

the record contained numerous examples of plaintiff's "documented insubordination, costly technical errors, and poor performance reviews"). Accordingly, plaintiff has failed to establish a *prima facie* case of discrimination with respect to the PIP because he has not demonstrated that he was meeting his employer's legitimate expectations.[12]

In addition, plaintiff has failed to adduce evidence from which a reasonable juror could conclude that the employer's actions were predicated on plaintiff's race. "Unsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Liberty Lobby*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "As courts have recognized repeatedly, even a pro se party may not avoid summary judgment by relying on bald assertions and speculative arguments." *Smith v. Vilsack*, 832 F. Supp. 2d 573, 580 (D. Md. 2011).

Plaintiff's complaint does not expressly allege that he was subjected to a hostile work environment. However, to the extent that plaintiff alleges that the above-described incidents (*i.e.* his increased responsibilities, counseling statement, and the PIP) created a racial or retaliatory hostile work environment, his claim also fails. A claim of hostile work environment is premised on the notion that "an employee's work environment is a term or condition of employment." *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009) (internal citations and quotation marks omitted). "[T]he standard for proving an abusive work environment is intended to be a high one." *Karim v. Staples, Inc.*, 210 F. Supp. 2d 737, 752 (D. Md. 2002).

---

[12] If anything, the PIP was intended to assist plaintiff in improving his employment skills.

"To survive summary judgment on a claim of a racially hostile work environment," a plaintiff must provide evidence of harassment by his co-workers, which a reasonable jury could find was "'(1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere,'" and must also show "'that there is some basis for imposing liability' for the harassment on the employer." *EEOC v. Xerxes Corp.,* 639 F.3d 658, 668 (4th Cir. 2011) (quoting *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183–84 (4th Cir. 2001)). *See also Hoyle,* 650 F.3d at 331; *Okoli v. City of Baltimore,* 648 F.3d 216, 220 (4th Cir. 2011); *Bonds v. Leavitt,* 629 F.3d 369, 385 (4th Cir. 2011).

The abusive or "hostile" work environment must be objectively hostile, not merely subjectively so. *See Bonds*, 629 F.3d at 385 (citing *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). In making the determination of whether a work environment is objectively hostile, several factors are relevant, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Bonds,* 629 F.3d at 385 (citation and internal quotation marks omitted). But, "complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII." *Sunbelt Rentals*, 521 F.3d at 315–16 (quotation marks and internal citations omitted). Moreover, "conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment." *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998) (citing *Carter v. Ball,* 33 F.3d 450, 461–62 (4th Cir.1994)).

Plaintiff has not established a *prima facie* case of hostile work environment because a reasonable jury could not conclude that the incidents in issue were spurred by racial animus.

Plaintiff has provided only conclusory allegations that the incidents occurred as a result of his race or his complaints about discrimination in the workplace. And, nothing suggests that the incidents of alleged mistreatment had a retaliatory or discriminatory motive. *See Causey*, 162 F.3d at 802 (affirming summary judgment where plaintiff "provided no evidence that the alleged acts of mistreatment were based on his race or age"); *Hall v. Bausch & Lomb, Inc.*, No. DKC 10-0215, 2012 WL 3536755, at *11 (D. Md. Aug. 13, 2012) (granting summary judgment to defendant where plaintiff's "entire case for harassment is based on her own conclusory allegations" and explaining that "unsubstantiated allegations . . . are patently insufficient to prove 'a linkage between the hostile behavior and [her] membership in a protected class'") (quoting *Douglas–Slade v. LaHood,* 793 F. Supp. 2d 82, 101 (D.D.C. 2011)).

Further, even if plaintiff could demonstrate that the actions occurred as a result of his race, these incidents are not sufficiently severe or pervasive to rise to the level of a hostile work environment. Certainly, the assignment of additional work, the requirement that plaintiff report to the client when supplies were running low, the issuance of a written counseling statement, and placement on a PIP are not "objectively abusive actions." *Combs-Burge v. Rumsfeld*, 170 Fed. Appx. 856, 862 (4th Cir. 2006) ("[A]ssigning individuals remedial tasks to correct their job performance and assigning individuals to difficult jobs are not objectively abusive actions, particularly considering that we 'do[ ] not sit as a kind of super-personnel department weighing the prudence of employment decisions made by [employers] charged with employment discrimination.'") (quoting *DeJarnette v. Corning Inc.,* 133 F.3d 293, 299 (4th Cir.1998)) (alterations in original). Indeed, the incidents at issue are far from the conduct necessary to establish actionable harassment. *Compare, e.g.*, *Collier v. Ram Partners, Inc.,* 159 F. Supp. 2d 889 (D. Md. 2001) (denying summary judgment for employer as to plaintiff's claim of hostile

work environment where (1) racial epithets were used repeatedly; (2) were coupled with physical threats; and (3) evidence supported the conclusion that racial epithets were knowingly tolerated by management) *with Hall*, 2012 WL 3536755, at *11 (concluding that criticism of plaintiff's job performance, accusation that plaintiff intentionally broke her own laptop, and requirement that plaintiff submit weekly faxes to report her visits and distribution of product samples to physicians did not constitute actionable harassment).

The incidents at issue here amount to nothing more than a series of ordinary personnel decisions. *Cf. Thorn*, *supra*, 766 F. Supp. 2d at 601 (plaintiff failed to establish a claim of retaliatory hostile work environment where the cited instances of alleged harassment "amount[ed] to instances where [plaintiff] disagreed with the management style or decisions of those who supervised him—and that alone is not actionable under Title VII"), *aff'd*, 465 Fed. Appx. 274 (4th Cir. 2012); *Douglas-Slade*, 793 F. Supp. 2d at 101 (grievances as to supervisor's management style cannot support a hostile work environment claim).

Accordingly, summary judgment will be granted in favor of defendants as to plaintiff's claims of racial discrimination and/or hostile work environment (Count 1).

    c.  Retaliation (Count 2)

In Count 2, plaintiff lodges a claim of retaliation, contending that defendants retaliated against him for "notif[ying] his supervisory chain of employment practices that he reasonably believed were discriminatory." *See* Am. Compl. ¶¶ 23–25. In particular, plaintiff alleges that he suffered retaliation as a result of his EEOC complaint when Beyer, Beauchamp, and Murphy "overrode plaintiff's authority" by assigning employee Cheryl Chalmus to work as a bartender at

an event in December 2010, despite plaintiff's objections that she was not "TIPS"[13] certified, in violation of ARAMARK's alcohol policy. *See* Am. Compl. ¶ 13.

In order to establish a *prima facie* claim of retaliation under Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli*, 648 F.3d at 223 (citations omitted); *see Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). As with a substantive discrimination claim, the *McDonnell Douglas* framework applies at trial: "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006)).

As noted, a plaintiff must first establish that he engaged in protected activity, such as filing a complaint with the EEOC. *Okoli*, 648 F.3d at 223-24. As the Fourth Circuit has explained, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 259 (4th Cir. 1998). "To fall under the protection of the opposition clause . . . behavior need not rise to

_____

[13] TIPS (Training for Intervention ProcedureS) is an alcoholic beverage service training program that ARAMARK requires for employees who sell or serve alcohol. Ellis Decl. Ex. 4 at 26; *see* Beyer Decl. at ¶ 17.

the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted).

The second element of the *prima facie* case pertains to an "adverse employment action." In a retaliation claim, the standard for an adverse employment action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). In the retaliation context, a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted).

Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist*, *supra*, 671 F. Supp. 2d at 738 (quoting *Burlington Northern*, 548 U.S. at 68). Even under the "lower bar" applicable to Title VII retaliation claims, "none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an "Attendance Warning,"' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. University of Maryland Alumni Ass'n*, --- F. Supp. 2d ----, 2013 WL 6158375, at *10 (D. Md. Nov. 22, 2013) (quoting *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011)). Moreover, Title VII's "antiretaliation

provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67.

The third element requires a causal connection between the protected activity and the adverse action. *Okoli*, 648 F.3d at 223. To satisfy this element, a plaintiff at trial must show that "the employer [took] the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). "[A] lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, No. JFM-12-3267, 2013 WL 4495817, at *6 (D. Md. Aug. 20, 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (although period of nine to ten months between protected conduct and adverse action presented "a very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

Nevertheless, mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001))

(affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"). And, pursuant to the Supreme Court's recent ruling in *University of Texas Southwestern Medical Center v. Nassar*, --- U.S. ----, 133 S.Ct. 2517, 2534 (2013), "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

At his deposition, plaintiff was asked how his complaint about his co-worker, Chalmus, and her lack of TIPS certification, affected his employment. Plaintiff answered: "After that not only was I placed on PIP but also I was given a lot more of a workload. I was short staffed . . . . And I believe it contributed to a hostile work environment." Pla. Dep. at 104:3-12. And, plaintiff indicated during his deposition that it was his belief that the "issuance of the fraud complaint" and the request for authorization to confirm his criminal history were in retaliation for his EEOC complaints. *Id.* at 56:12-16.

Plaintiff's claim that his supervisors retaliated against him by permitting Chalmus to work as a bartender even though she was not TIPS certified fails as a matter of law. Allowing Chalmus to work as a bartender did not constitute an adverse action against plaintiff for the purpose of Title VII and MFEPA's anti-retaliation provisions, as it would not have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Cf. Parsons v. Wynne*, 221 Fed. Appx. 197, 198 (4th Cir. 2007) (finding that plaintiff failed to establish a *prima facie* case of retaliation because plaintiff's performance evaluation and removal from the alternate work schedule would not have dissuaded a reasonable worker from making or supporting a charge of discrimination); *Simmington v. Gates*, No. DKC 08-3169, 2010 WL 1346462, at *13

(D. Md. Mar. 30, 2010) (finding that the incidents complained of would not dissuade a reasonable worker from making or supporting a charge of discrimination because they were "negligibly burdensome"). Although plaintiff clearly disagreed with the supervisor's decision, Title VII's anti-retaliation provision does not protect against "petty slights" and "minor annoyances" that often occur in the workplace. *See Burlington Northern*, 548 U.S. at 68; *Geist*, 671 F. Supp. 2d at 738. Moreover, plaintiff has not shown that any harm or injury resulted from allowing Chalmus to work as a bartender at the event. *Burlington Northern*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). Accordingly, plaintiff cannot establish a retaliation claim with respect to this incident.

Assuming that plaintiff has established a *prima facie* case of retaliation with respect to his PIP and termination,[14] his claim fails because he cannot show that defendants' legitimate, non-discriminatory reason for either action was pretextual.[15]

ARAMARK proffered legitimate, non-discriminatory reasons for placing plaintiff on a PIP. As noted, ARAMARK received multiple complaints from subordinate employees about the manner in which plaintiff treated them, including complaints that he raised his voice, yelled, and cursed. Beyer Decl. at ¶ 10. Moreover, Hemphill's level of care for client/customer service fell

---

[14] Where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment, it is a common practice to assume, without deciding, that the plaintiff has established a *prima facie* case. *See, e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319–20 (4th Cir. 2005); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736–37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

[15] As defendants note, it is unclear which complaints plaintiff relies upon for his retaliation claim with respect to the PIP or his termination.

below what was expected of managers, and he failed to perform managerial tasks in a timely manner. *Id.* at ¶ 11. Hemphill also violated ARAMARK's policy on reporting absence from work, which resulted in a disruption of operations. *Id.* at ¶ 11.

To be sure, Hemphill appears to disagree that there were problems with his work performance. *See* ECF 73. However, the merits in regard to the quality of plaintiff's work is not the issue. The evidence shows that the employer had concerns as to plaintiff's performance and the concerns were not pretextual. Put another way, plaintiff's arguments as to the adequacy of his job performance are not relevant to the question of whether, from the employer's perspective, Hemphill was satisfactorily performing his job duties, as "it is the perception of the decisionmaker which is relevant." *Holland*, *supra*, 487 F.3d at 217; *see also Parish*, *supra*, 429 Fed. Appx. at 218. Because Hemphill has not proffered any evidence from which a reasonable jury could conclude that the stated reasons for the PIP were pretextual, he cannot prevail on a claim of retaliation with respect to this incident.

Likewise, plaintiff has failed to rebut ARAMARK's legitimate, non-retaliatory explanation for terminating plaintiff's employment. Of import here, plaintiff admitted at his deposition that, as of the time he completed the employment application, he had been convicted of manslaughter in the second degree, criminal possession of a weapon in the third degree, and attempted criminal possession of a weapon in the third degree, and that he served three prison terms. *See* Pla. Dep. at 59-69. Moreover, plaintiff was expressly advised on the application that "any misrepresentations or omission of facts in [the] application may be justified for refusal to hire, or termination of employment." Def. Ex. A, ECF 69-1 at 8; Pla. Ex. A, AMK_HEM_000004. Yet, in response to a broad question on the employment application

asking about any prior convictions, without regard to what or when, plaintiff failed to disclose his prior criminal record.

Plaintiff claims that, when he was completing the employment application in August 2004, an administrative assistant indicated that he did not need to disclose criminal history that was older than five years. Pla. Dep. at 19:12 – 20:18. But, that assertion is at odds with the text of the employment application, which was not limited in scope or time as to the applicant's prior record. Nor has plaintiff offered any evidence that he informed Christian or Ellis about his conversation with the assistant when he met with them to discuss the falsification of his application. In any event, plaintiff patently misled the employer by implying on his application that the "Collins Café" was a restaurant when, in fact, it was actually part of Collins Correctional Facility. And, there is no evidence that ARAMARK failed to terminate other employees who lied on their employment applications. *See* Ellis Decl. at ¶ 13; Beyer Decl. at ¶ 4 ("Other than Hemphill, I am not aware of any ARAMARK employee who has lied on his or her employment application.").

And, for the reasons discussed, *supra*, plaintiff cannot establish pretext based upon the argument that he had two separate periods of employment with ARAMARK. Moreover, plaintiff conceded that he mentioned nothing about a new job application allegedly completed in November 2004 during his meeting with Christian and Ellis. *See* Pla. Dep. at 81:17-18.

Plaintiff asserts that he "need not prove his position as to any element of his . . . claims in a case for retaliation." Rebuttal, ECF 73 at 6. However, in order to survive a motion for summary judgment, plaintiff must put forth some evidence supporting each element essential to his claims. *See Celotex, supra,* 477 U.S. at 322–23 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Plaintiff has not met this standard. Therefore, summary judgment will be granted for defendants with respect to plaintiff's retaliation claim (Count 2).

### d. Wage Discrimination (Count 3)

In Count 3, plaintiff claims that he was paid less than his non-African-American colleagues.[16] *See* Am. Compl. ¶ 8, 17, 29; *see* Pla. Dep. 86:17-22 – 87:1-2. To establish a *prima facie* case of wage discrimination, plaintiff must show that: (1) he is a member of a protected class; (2) he was paid less than an employee outside of the protected class; and (3) the higher paid employee was performing a substantially similar job. *See Kess v. Mun. Employees Credit Union of Baltimore, Inc.*, 319 F. Supp. 2d 637, 645 (D. Md. 2004); *see also Siraj v. Hermitage in N. VA*, 51 Fed. Appx. 102, 112-13 (4th Cir. 2002); *Brinkley-Obu v. Hughes Training, Inc.,* 36 F.3d 336, 343 (4th Cir. 1994). "[T]wo parties are similarly situated if their job requirements are similar in the level of competency, education, and requirements." *Siraj*, 51 Fed. Appx. at 113 (citing *Lavin-McEleney v. Marist College,* 239 F.3d 476 (2d Cir. 2001)).

There is no dispute that plaintiff is a member of a protected class. However, his allegations fail to support an inference that he received disparate pay because the two alleged comparators he has identified, Beauchamp and Aaron Rock, were not performing a substantially similar job. *See* Pla. Dep. at 86:17 – 87:5.

Beauchamp was plaintiff's direct supervisor during the majority of the time that he served as Chef/Manager. *See* Beyer Decl. at ¶ 8. In her role as Director of Food and Beverage,

---

[16] In his Rebuttal, plaintiff seemed to argue that he suffered gender-based wage discrimination in violation of the Equal Pay Act. *See* ECF 73 at 4. However, in his Response to Motion for Surreply, plaintiff said: "Nowhere in Plaintiff's reply to summary judgment or pleadings did Plaintiff allege a claim of gender discrimination." ECF 81 at 1.

she helped to oversee the entire operation at MWCC.  *See id.* at ¶ 14.  Plaintiff acknowledged at his deposition that Beauchamp left her role at the Piper Facility in order to assume the role of Director of Food and Beverage, and that he reported to her until Beyer became his supervisor in 2011.  Pla. Dep. at 94:3-17.  By contrast, plaintiff was the Chef/Manager for one facility.  *See* Beyer Decl. at ¶ 14.  Plaintiff's claim that he was unfairly paid in comparison to Beauchamp appears to be founded on his contention that he had to cover the work of two managers while at the Piper Facility.  *See* Pla. Dep. at 93:13-22 – 94:1-2; Rebuttal, ECF 73 at 5.  But, even if true, the record reflects that the scope of Beauchamp's responsibility was much greater than plaintiff's.

Rock worked as an Executive Chef for both the conference center and the McAuley Café. *See* Beyer Decl. at ¶ 15.  Like Beauchamp, Rock oversaw a larger operation than did plaintiff. Rock also had more job responsibilities than plaintiff, which included being required to work both evening and weekend events, helping the sales team and external clients with designing menus, and participating in tastings.  *See id.* at ¶ 15.  Moreover, when Rock joined ARAMARK, he had more extensive experience in the food industry than plaintiff purportedly had.  *See id.* at ¶ 16.  For example, the record reflects that Rock attended the Culinary Institute of America, held the position of District Chef for Compass Group, and obtained the National Restaurant Association designation for Food Management Professional in 2004.  *Id.*

For these reasons, plaintiff has failed to draw adequate parallels between his job responsibilities and those of his purported comparators.  Without similarly situated comparators, plaintiff cannot demonstrate that he received unequal pay despite working the same job as non-African-American employees, so as to establish a *prima facie* case of pay discrimination.  *See Alexander*, *supra*, 2011 WL 1231029, at *6 (dismissing plaintiff's MFEPA wage discrimination

claim where she failed to identify a male employee with a similar job who was paid more than she was); *Floyd v. U.S. Dep't of Homeland Sec.*, No. RDB-09-0735, 2009 WL 3614830, at *8 (D. Md. Oct. 27, 2009) (finding that plaintiff did not make out a claim for disparate pay because she did not establish that her purported comparator was "'similarly situated' or 'nearly identical in all respects'").

### d. Termination and Wrongful Discharge (Counts 4 and 6)

In Counts 4 and 6, plaintiff alleges that he was unlawfully terminated and discharged from his position because of his race. *See* Am. Compl. ¶¶ 32, 45. To establish a *prima facie* case of discriminatory termination under Title VII, a plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse action; and (4) the position remained open or was filled by similarly qualified applicants outside of the protected class. *Bonds*, *supra*, 629 F.3d 386.

It is undisputed that plaintiff is a member of a protected class and that he suffered an adverse employment action when his employment was terminated. Moreover, no evidence has been offered by either party as to the fourth prong of the *prima facie* case. As to the third prong, however, plaintiff cannot demonstrate that he was meeting his employer's legitimate expectations; as discussed earlier, Hemphill falsified his employment application by failing to disclose his criminal history. *See Rocha v. Coastal Carolina Neuropsychiatric Crisis Servs., P.A.*, No. 7:12-CV-2-D, 2013 WL 5651801 (E.D.N.C. Oct. 16, 2013) ("By misstating a material fact on his employment application concerning his criminal history, [the employee] failed to meet [the employer's] legitimate expectations."); *Nelson v. DeVry, Inc.*, No. 07-4436, 2009 WL 1213640 (E.D. Pa. Apr. 23, 2009) ("The failure of [plaintiffs] to disclose their backgrounds, as

was required company policy, made them subject to the provision that they could be terminated at any time for dishonesty. An employee who violates a company policy which results in that employee's discharge is not meeting the employer's legitimate expectations."). Therefore, plaintiff has failed to establish a *prima facie* case.

Even assuming, *arguendo*, that plaintiff could demonstrate a *prima facie* case, the falsification of plaintiff's employment application with respect to his criminal history clearly satisfies defendants' burden to articulate a legitimate, nondiscriminatory reason for the adverse action. Therefore, plaintiff must demonstrate that he could prove to a fact finder "'*both* that the reason was false, *and* that discrimination was the real reason.'" *Adams, supra,* 640 F.3d at 560 (quoting *Jiminez v. Mary Washington Coll.,* 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original). Plaintiff has not advanced evidence to suggest that the decision to terminate his employment was a pretext for discrimination on the basis of race.

The Fourth Circuit has said that, "if it can be shown that a false statement made by a job applicant induced an employer to hire the applicant, and if the employer can provide a showing that it would not have hired him if it had known the truth, then the defendant employer is provided with a defense to a Title VII claim which indicates that the misrepresentation, and not the claimed discrimination, was the reason for the disciplinary action." *Washington v. Digital Equip. Corp.*, No. 9-1217, 968 F.2d 1213, at *5 (4th Cir. 1992) (unpublished) (finding that the employer had established a defense to a Title VII claim where defendant provided evidence the plaintiff misrepresented himself and that "it had a policy of not hiring people without a college education, or people who make false statements when they apply for a job.") (citing *Smallwood v. United Air Lines, Inc.,* 728 F.2d 614, 624 (4th Cir. 1984)). Here, defendants provided evidence that plaintiff misrepresented his criminal history on the employment application and that

ARAMARK had a policy of not hiring people who make false statements when they apply for a job. Consequently, defendants have shown that Hemphill's misrepresentation, and not the claimed discrimination, was the reason for the termination of plaintiff's employment.

In sum, plaintiff has not proffered evidence by which a finder of fact could conclude that plaintiff's termination constituted unlawful discrimination under Title VII. Accordingly, summary judgment will be granted to defendants as to plaintiff's unlawful termination claims (Counts 4 and 6).

### 2. Breach of Contract (Count 5)

In Count 5, plaintiff brings a Maryland state law claim for breach of contract.[17] He contends that "Defendant's employee handbook and his salary and working conditions constituted a contract of employment." Am. Compl. ¶ 35. Plaintiff observes that the "employee handbook had provisions dealing with equal employment opportunity, termination, and evaluations," *id.* ¶ 39, and asserts: "By terminating plaintiff, defendant violated the terms of its own employee handbook and thereby breached the parties' employment contract, since it terminated him for discriminatory and/or retaliatory reasons and in any event because there was no cause to terminate plaintiff based on his performance." *Id.* ¶ 40.

Defendants counter that "the Employee Handbook contains a clear, conspicuous, and unequivocal disclaimer indicating that it is not an employment contract." Cross-Motion, ECF 69 at 24. Therefore, they insist that the contract claim must fail.

There is no indication that plaintiff and ARAMARK entered into an express employment contract for a definite term. In the absence of such a contract, plaintiff was an at-will employee. *Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 93 Md. App. 772, 790, 614 A.2d 1021, 1030 (1992)

---

[17] In the body of his Amended Complaint, plaintiff also alleges breach of the covenant of good faith and fair dealing. Therefore, I will discuss the covenant.

(explaining that, in the absence of an express employment contract for a definite term, plaintiff was an at-will employee as a matter of law). "[A]t-will employment is a contract of indefinite duration that can be terminated at the pleasure of either party at any time." *Id.*; *see also Adler v. Am. Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 490, 665 A.2d 297, 307 (1995).[18]

One exception to this doctrine concerns situations in which the at-will employment relationship is modified by the provisions of a personnel policy. *Bagwell*, 106 Md. App. at 490 (citing *Staggs v. Blue Cross of Md., Inc.,* 61 Md. App. 381, 486 A.2d 798 (1985)); *see also Elliott v. Bd. of Trustees of Montgomery Cnty. Cmty. Coll.*, 104 Md. App. 93, 100, 655 A.2d 46, 49 (1995) ("[A]n employee handbook may, in some circumstances, become an unilateral contract."). Nevertheless, "Maryland courts have been clear that 'an employer may avoid contractual liability by any terms which clearly and conspicuously disclaim contractual intent.'" *Scott v. Merck & Co., Inc*., 497 Fed. Appx. 331, 335 (4th Cir. 2012) (quoting *Castiglione v. Johns Hopkins Hosp.,* 69 Md. App. 325, 517 A.2d 786, 793 (1986)); *see*, *e.g.*, *Hrehorovich*, 93 Md. App. at 776, 794–95, 614 A.2d at 1023, 1032 (affirming the dismissal of a breach of contract claim based on an employee manual that contained the following "clear and conspicuous" disclaimer: "This manual does not constitute an express or implied employment contract and nothing in the manual is intended to bind [the employer] contractually").

---

[18] Nonetheless, at-will employment cannot be terminated for an illegal reason, such as race or gender. *See Molesworth v. Brandon*, 341 Md. 621, 628, 672 A.2d 608, 612 (1996); *Adler v. Am. Standard Corp.*, 2291 Md. 31, 35, 432 A.2d 464, 467 (1981). The MFEPA, *inter alia*, makes it unlawful to terminate an employee because of race. *Adler*, 291 Md. At 35, 432 A.3d at 467. However, as discussed, *supra*, I have found that plaintiff's claims of race discrimination under Title VII and MFEPA cannot survive summary judgment. Therefore, this exception to the terminable at-will doctrine does not apply.

Here, the record reflects that plaintiff signed multiple documents containing such a disclaimer. Specifically, plaintiff signed an acknowledgment in connection with his receipt of the Employee Handbook on August 20, 2004, which stated: "In signing this acknowledgment, I am verifying that I understand that no contractual employment rights have been granted." Ellis Decl. Ex. 5, ECF 69-1 at 144. This acknowledgment also proclaims that the Handbook "is not intended . . . to grant any contractual employment rights to the employees of ARAMARK." *Id.* And, the record contains additional Employee Handbook acknowledgements, signed by plaintiff in December 2004 and October 2005, which state: "I further understand that this information is not regarded as a contract. I acknowledge that this handbook does not guarantee my continued employment at ARAMARK and that my employment may be terminated by me or by ARAMARK at any time for any reason, with or without cause." Ellis Decl. Exs. 6 and 7, ECF 69-1 at 146, 148. Because these disclaimers were clear and unambiguous, and plaintiff neither disputes the existence nor authenticity of these acknowledgments, plaintiff cannot show the existence of a contractual obligation. As such, plaintiff's breach of contract claim must fail.

Plaintiff also claims that, by terminating his employment, "defendant breached the covenant of good faith and fair dealing which was inherent in the parties' employment contract." *See* Am. Compl. ¶ 41. Maryland law recognizes an implied covenant of good faith and fair dealing in contracts. *Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 444 (4th Cir. 2001). "[U]nder the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 184 (4th Cir. 2000) (*citing Automatic Laundry Serv., Inc. v. Demes*, 216 Md. 544, 141 A.2d 497, 500-01 (1958)). However, because I conclude that

plaintiff was terminable at will, plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails. *See Suburban Hosp. Inc. v. Dwiggins,* 324 Md. 294, 310 (1991) (declining to imply a general requirement of good faith and fair dealing in employment at will situations); *Marrs v. Marriott Corp.*, 830 F. Supp. 274, 281 (D. Md. 1992) (finding that plaintiff's claim of breach of the implied covenant of good faith and fair dealing failed because the court concluded that plaintiff was terminable at will); *see also Farasat v. Paulikas*, 32 F. Supp. 2d 244, 249 (D. Md. 1997) (dismissing plaintiff's breach of the duty of good faith claim because the court found that no employment contract existed between plaintiff and defendant), *aff'd*, 166 F.3d 1208 (4th Cir. 1998).

Accordingly, defendants are entitled to judgment as a matter of law with respect to plaintiff's claims for breach of contract and breach of the covenant of good faith and fair dealing (Count 5).

### D.        <u>Motion for Leave to Amend</u>

On April 25, 2013, plaintiff filed a second motion to amend, seeking to "expound upon issues contained in plaintiff's submission to the EEOC but not elaborated upon in his initial pleading initially submitted by his former counsel." ECF 74 at 2. Plaintiff's proposed amended complaint reflects that plaintiff seeks to add two counts: (1) "Refusal to Enter into a Contract Based on Race;" and (2) "Offer to Make a Contract Based on Discriminatory Terms." ECF 74-1 at 15-16. Specifically, plaintiff alleges that defendants violated 42 U.S.C. § 1981[19] "by failing to enter into a contract with plaintiff based on his race and any stated reason is a mere pretext for doing so," and "by failing to enter into a contract with plaintiff and offering the same

_____

[19] Plaintiff again requested leave to add claims under § 1981 in his Response to Motion for Surreply. ECF 81. Defendants note that plaintiff failed to seek consent of defendants' counsel prior to filing either Motion, as required by Local Rule 103.6(d).

considerations given his white counterparts." ECF 74-1 at 15-16; *see* ECF 81 at 1-4. Plaintiff also seeks to include additional factual allegations, which detail defendants' apparent failure to promote plaintiff. *See* ECF 74-1 at 4-5.

Plaintiff contends that defendants would not be prejudiced by granting leave to amend. *See* ECF 74 at 3. According to plaintiff, "[t]he facts described in the Amended Complaint are well-known to Defendants, because they were previously made aware of them in the EEOC complaint." ECF 74 at 4; *see* ECF 82 at 3. Plaintiff also reasons that he is not seeking any new documents to support his allegations, and that "defendants have ample opportunity to respond to these additional counts while dispositive motions are pending." *Id.*

Defendants oppose the Motion to Amend.[20] *See* ECF 80; ECF 83. In particular, defendants assert that plaintiff has not shown good cause for amending his complaint a second time, defendants would be prejudiced if the Court granted the motion, and plaintiff's proposed amendments would be futile. ECF 80 at 4-8; *see* ECF 83 at 4-6.

Fed. R. Civ. P. 15(a)(1), titled "Amendment as a Matter of Course," grants a party the right to "amend its pleading once as a matter of course within . . . 21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or a motion under Rule 12(b), (e) or (f), whichever is earlier." When, as here, plaintiff has previously filed an amended complaint, plaintiff must rely on Rule 15(a)(2), which states: "In all other cases, a party may amend its pleadings only with the opposing party's

---

[20] After defendants opposed the Motion to Amend, plaintiff filed his Response to Motion for Surreply, ECF 81, and a "Rebuttal and Memorandum of Law in support of Motion for 2nd Amended Complaint" (ECF 82), which set forth additional arguments in support of amendment. Defendants then filed an "Opposition to Plaintiff's Request to Amend His Amended Complaint That Was Contained in Plaintiff's Response to Defendants' Motion for Sur Reply [sic] and Rebuttal to Defendants' Cross-Motion for Summary Judgment" (ECF 83).

written consent or the court's leave." *See Laber v. Harvey,* 438 F.3d 404, 426 (4th Cir. 2006). The defendants do not consent.

"Although the decision whether to grant leave rests within the sound discretion of the district court, the federal rules strongly favor granting leave to amend." *Medigen of Kentucky, Inc. v. Pub. Serv. Comm'n of W. Virginia*, 985 F.2d 164, 167-68 (4th Cir. 1993) (internal citation omitted). "[T]he general rule is that leave to amend a complaint under Federal Rule of Civil Procedure 15(a) should be freely given, unless 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (quoting *Laber*, 438 F.3d at 426) (internal citation omitted).

Despite the liberal standards of Rule 15(a), plaintiff must first meet the "good cause" test of Rule 16(b)(4) because the deadline set in the Scheduling Order for the amendment of pleadings has passed. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); *Nourison Rug Corp. v. Parvizian,* 535 F.3d 295, 298–99 (4th Cir. 2008) ("[A]fter the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings."); *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 631 (D. Md. 2003) (noting the tension between Rules 15(a) and 16(b) and explaining that "once the scheduling order's deadline for amendment of the pleadings has passed, a moving party first must satisfy the good cause standard of Rule 16(b); if the moving party satisfies Rule 16(b), the movant then must pass the tests for amendment under 15(a)"). Notably, "'the focus of the [good cause] inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.'"

*Rassoull v. Maximus, Inc.,* 209 F.R.D. 372, 374 (D. Md. 2002) (quoting *Marcum v. Zimmer,* 163 F.R.D. 250, 254 (S.D. W.Va. 1995)).

"The analysis under Rule 16(b) is less focused on the substance of the proposed amendment and more concerned with the timeliness of the motion to amend 'and the reasons for its tardy submission.'" *CBX Technologies, Inc. v. GCC Technologies*, LLC, No. JKB-10-2112, 2012 WL 3038639 (D. Md. July 24, 2012) (quoting *Rassoull*, *supra*, 209 F.R.D. at 373–74), *aff'd*, 533 Fed. Appx. 182 (4th Cir. 2013). "The factors to be considered in determining whether there is good cause or 'excusable neglect' include the 'danger of prejudice to the non-moving party, the length of and its potential impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith.'" *Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768-69 (D. Md. 2010) (quoting *Rothenberg v. Marriott Int'l, Inc.,* No. CCB–08–173, 2008 WL 687033, at *1 (D. Md. Feb. 29, 2008)).

Here, suit was removed to this Court in May 2012, and a Scheduling Order was entered on July 6, 2012. ECF 17. It set a deadline of August 6, 2012, for amendment of pleadings, and a cut-off for discovery on November 5, 2012. *Id.* On November 19, 2012, plaintiff moved to amend his complaint. ECF 33. Then, on November 28, 2012, I granted plaintiff's motion to extend discovery for an additional seven weeks. ECF 37. And, by Memorandum Opinion and Order dated January 2, 2013 (ECF 45, 46), I granted plaintiff's first motion for leave to amend his complaint. As a result, the discovery deadline was extended again, this time to February 15, 2013, with a revised dispositive motions deadline of March 29, 2013. ECF 45. Plaintiff did not move for leave to file a second amended complaint until April 25, 2013, more than two months after the close of the extended discovery period and after the parties' submission of cross-motions for summary judgment.

Plaintiff has offered no real justification for his failure to include the proposed claims in his complaint or in his first amended complaint, so as to establish good cause for the delay. Indeed, Hemphill concedes that the underlying facts were known to him when he filed his complaint with the MCHR. *See* ECF 74 at 4. But, he seeks leave to add new claims under 42 U.S.C. § 1981 because he "discovered new avenues of redress based upon the admissions of defendants during the discovery period that were not pled in the complaint, but disclosed to defendants in sufficient time to permit defendant to address them by way of law and motion." ECF 81 at 6; *see* ECF 82 at 5. Even assuming, *arguendo*, that the facts would support a claim under § 1981, it is plaintiff's responsibility to timely identify all legal theories and avenues for redress. "Pro se litigants are entitled to some deference from courts. But they as well as other litigants are subject to the time requirements and respect for court orders without which effective judicial administration would be impossible." *Ballard v. Carlson*, 882 F.2d 93, 96 (4th Cir. 1989) (internal citation omitted); *see Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

And, even if plaintiff learned of the information late in discovery, he waited over two months after discovery closed to seek leave to amend. *See Howard v. Inova Health Care Servs.*, 302 Fed. Appx. 166, 181 (4th Cir. 2008) ("'[A] motion to amend should be made as soon as the necessity for altering the pleading becomes apparent.'") (quoting *Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987)). The belated proposed amendment seems to be the result of a "lack of diligence and carelessness" on the part of plaintiff. *See Rassoull*, 209 F.R.D. at 374 ("Lack of diligence and carelessness are 'hallmarks of failure to meet the good cause standard.'") (quoting *West Virginia Housing Dev. Fund v. Ocwen Technology Xchange, Inc.,* 200 F.R.D. 564, 567 (S.D. W.Va. 2001)).

Moreover, "[w]hen considering a motion for leave to amend, 'the court may take into account the stage of the proceedings,' such as whether the parties have completed discovery." *Elat v. Ngoubene*, -- F. Supp. 2d -- , 2014 WL 253411 (D. Md. 2014) (quoting *Skinner v. First Am. Bank of Virginia*, 64 F.3d 659, 1995 WL 507264, at *2 (4th Cir. 1995) (unpublished)); *see also Laber*, 438 F.3d at 427 ("Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing."). Because plaintiff did not move to amend until after both parties had filed motions for summary judgment, his argument that defendants would not be prejudiced because "defendants have ample opportunity to respond to these additional counts while dispositive motions are pending" is not well taken. By raising new allegations at this point in the litigation, plaintiff has deprived defendants of the ability to question plaintiff during his deposition about the allegations, conduct any necessary follow-up discovery, or address the allegations in defendants' Cross-Motion. If leave were granted, defendants would also be prejudiced because of the obvious delay and because of the time and expense already incurred in discovery and preparation of a summary judgment motion, and the need for further discovery. *See Deasy*, 833 F.2d at 41 (affirming denial of leave to amend where the motion to amend came right before trial and after discovery was complete); *Skinner*, 1995 WL 507264, at *3 (finding denial of leave to amend proper where the motion was made after the completion of discovery and when the case was ripe for summary judgment; recognizing prejudice would result where defendant "had already incurred significant time and expense in discovery and in preparation for a summary judgment motion").

Plaintiff's argument that, by virtue of the EEOC charge, defendants were on notice of the new factual allegations in the Amended Complaint, is not persuasive. Notably, plaintiff does not point to any MCHR or EEOC charges in the record containing factual allegations related to

failure to promote.  Moreover, "[t]he burden rests primarily upon the plaintiff to amend his complaint, not upon the defendant to anticipate a new claim." *Deasy*, 833 F.2d at 41.

Upon consideration of the record and the parties' arguments, I conclude that another amendment of the complaint would be unfair and improper.  And, in the alternative, for the reasons set forth above, any amendment would be futile.  Therefore, I will deny plaintiff's Motion to Amend.

## Conclusion

For the foregoing reasons, plaintiff's Motion will be denied and defendants' Cross-Motion will be granted.  Plaintiff's Motion to Amend will also be denied.  A separate Order follows, consistent with this Memorandum Opinion.


Date: March 25, 2014                    _____/s/_____
                                        Ellen Lipton Hollander
                                        United States District Judge